Good morning, Your Honors. Jonathan Kirschbaum, Office of the Federal Defender for Mr. LaPena. I also wanted to acknowledge the presence of my colleague Jeremy Barron, who was on the brief. I'd like to reserve three minutes for rebuttal, if I may. Okay. I'd also like to start with one of our ineffectiveness claims. Without any strategic justification, Frank's attorneys failed to impeach Weekland with his motive for unrecanting. Weekland was given a significant benefit here. Weekland agreed to switch his story to stop the state from sending the nasty parole letters which were preventing his release from prison. Incredibly, the jury never heard about this. Instead, Weekland claimed that he was testifying because he had undergone a moral transformation and had regained his values. Failing to raise this manner of impeachment was a serious error that caused Frank significant prejudice. So, again, we're talking about impeachment here and we're talking about an attorney's impeachment. What is my standard of review here? It's a deferential standard of review. Isn't it doubly deferential here? It is doubly deferential. Because not only have I got the Nevada Supreme Court coming out and saying, keep your nose out. I've looked at everything that needs to be said here, and I've determined the attorney was fine. But I also have to give deference to the attorney himself, don't I? Because this is, in fact, one of those things where the attorney's own, if you will, abilities are put on the stick. And impeachment would certainly give deference to what he suggests. So you're saying with a double deferential standard of review, I should say he's ineffective. I do believe that's the case here, Your Honor. Wasn't Wheatland significantly impeached before? He was significantly impeached. And wasn't his testimony corroborated by other witnesses? Well, if you talk about corroboration, that does not go. I'm just trying to. I mean, my worry is that here we are. We're trying to say that the attorney is bad. I found Wheatland significantly impeached anyway. And all you're talking about is one more impeachment. I'm trying to say, is that really that big a deal? And then I went to whether his testimony was corroborated, and we can argue about that, but you didn't start there. I kind of think it was. So I'm trying to think, how would the outcome have changed if the jurors had learned why he changed his story one more time? Well, there's two separate parts that I'd like to address in your question. The first is about why this impeachment evidence was so important. This impeachment evidence was of a different category altogether. It established motive, and it established a broader story here that the defense needed to tell the jury. The defense needed to tell the story as to why Wheatland was switching back to falsely accusing Frank after previously recanting. None of the other impeachment evidence addressed that. And the broader themes here was that Wheatland falsely accused Frank whenever he was given a benefit. And he, in the intervening time, he recanted. He said, all of what I've said before is false. What else would the jury want to know than why he was switching back? They didn't know that. Instead, based on counsel's failure to raise this issue, Wheatland says to the jury, oh, I've regained my values. I've gone through a moral transformation. I'm testifying here because I know what's right, and I need to go back to my original story. But that was false. So the jury could not reliably assess his testimony unless they were told his motive. Well, that's suggesting that we didn't have any of this other significant impeachment in the record. But, I mean, we had significant impeachment in the record. Including that testimony from a psychologist who says he's a dang psychopathic liar. I mean, he was impeached this way, that way. I mean, if I had been on the jury, I would have thought, why would I believe that guy? But evidently they did. And they did. And that's why this extra impeachment was important. That's why we should have impeached more and more and more. But explain to them why he would be falsely accusing him this time. It was different. Just calling him a liar was not enough. It was about why he was coming back into court and changing his story. What else would the jury want to know? And going back to Your Honor's question before about corroboration, that's moving away from deficient performance and into prejudice. So if we're talking about whether or not there's corroboration for his testimony, that has nothing to do with counsel's performance. It has to do with whether or not it had an impact on the case. And here I would like to transition into the corroboration argument. Not the corroboration argument. I would like to transition into the problems with the State's case here. Because this was a close evidentiary case. We are in State court. There's this remarkable fact in State court that the State court litigation that went on for many, many years is bookended by two dissents, two dissents where the multiple Nevada Supreme Court judges discussed the problems with the evidence. There has always been fundamental problems with the evidence here. Not just the incredible nature of Wheatland's testimony. We've pointed out how Wheatland's description of the murder is not consistent in almost every facet with the physical evidence. It is as if he has no idea how this — how Hilda was actually killed. But beyond that, the State's theory of the case never made any sense. This bizarre love triangle with a double murder and a double inheritance, it doesn't make any sense. There were far more logical connections to draw here. And we can be confident that any error on counsel's part would have an impact here because of the closeness of the evidence. I heard your argument. Okay. Thank you. I guess I'll reserve the remainder of my time. Oh, that's where you want to stop? Well, I guess I would then — never mind. I would go deeper. Okay. I mean, if you want to quit, I'm glad to have you. No, no. I would actually love to jump right into our actual innocence argument here because I just talked about the weaknesses in the case. And I previously mentioned the problems with Wheatland's testimony. First of all, whenever you start into these arguments, I like you to think about what my standard of review was because every one of these, it seems to me that one gets in there and one can make a good argument, a jury argument, but when one thinks about what my standard of review is, their argument is not nearly so good. So if we're really going to go to an actual innocence question, what have you got to prove? I think that's a very good question. And I think if we assume that this right exists and that it's something that— I mean, first of all, I'm not sure it exists, but none of my court will really attack it. I would love to attack it, but I get some of these panel members who I want to get unanimity, so I don't attack it either. So here we are. We're right here at the cusp. And we don't think there is one, but we don't know, so we just assume it exists. And then you have to prove what? Well, I think this Court in Carragher set forth the standard, or at least suggested the standard, which is that we do have to affirmatively prove innocence, meaning— That he is probably innocent. That's correct. And so we think that we have met that standard. And one way that we think that lies at the core of the sexual innocence argument is the fact that Weekland's description of the manner of death is wrong in almost every single way. But how does it show that your client is innocent? So, I mean, it seems like you're showing that the government's theory was no good and their evidence was no good, but innocence might require something more than that. Like, maybe Weekland is protecting someone else, but that doesn't mean that your client didn't hire them to kill this person. Well, we think that—well, under the indictment and what the jury was charged, this was—Frank was charged with a contract killing. So if Weekland didn't kill Hilda, then he can't be guilty of a contract killing. But, like, do we even know that Weekland didn't kill Hilda? We know that he gave testimony that didn't really make sense about it, but I don't know. Maybe he did that because there was someone else there that he's trying to not give details about or protect somehow because the other person helped, or who knows why he gave this weird testimony, right? I mean, it's hard to see how—it's not like the evidence you have is that Frank was actually in Hawaii and never had the opportunity to talk to Weekland or something like that. Well, I mean, it's packaged with the fact that not only does it make no sense, his testimony about how the murder happened, but also the State's theory as to why Frank would even hire him. I mean, this love triangle where first they would kill Hilda, then Rosalie, who was still married at the time, would then marry Marvin, and then Marvin would somehow die, and then they would get the inheritance, and that even Martin would get the inheritance from Hilda. It never made any sense. It never made sense from the beginning. Murder generally doesn't make sense. That's our main problem. But what did the district court do? What did the trial court do with that issue? Trial court, meaning the district court down below? Yeah. The district court essentially combined that with the insufficiency argument and addressed them together. Well, wasn't there some discussion about whether it was exhausted or not? We believe that it was exhausted through. I know what you believe. I'm asking you what the trial court did with it. The trial court didn't discuss exhaustion at all. It went straight to the merits. The State admitted or conceded that this particular ground, it was Underground 9, I believe, down below, was exhausted. So the district court never dealt with the issue number 2 on this particular issue? Well, the district court just combined it with the ineffectiveness claim, even though it was clearly pled as an innocence argument, not just an insufficiency argument. Well, what about the exhaustion? Has it been exhausted? Well, through the motion to dismiss in State court and then the appeal from the denial of that motion, it was exhausted. It was raised as an innocence claim. It was described as a miscarriage of justice claim. It went into the same arguments that we've raised now. It was tagged to due process and fair trial in the appellate brief on the appeal from the denial of the motion. So we think it's exhausted. Okay. But the district court has never ruled on that issue. Well, the district court didn't have to rule on it because the State acknowledged that it was exhausted in response, whether or not that's something that, you know, I don't see why the district court would on its own tackle exhaustion if the State says that that claim is exhausted. Well, I was just curious. It didn't seem to me that we had anything to review. The district court's never ruled on this second issue, and I just didn't know how we got by it. Well, I mean, certificate of appealability was granted on the actual innocence issue by this court. I mean, if this court believes that the district court didn't address it, then I guess it can be remanded for the district court to address it. I think that regardless of exhaustion, there are certain issues that we would want this court to consider. If it's exhausted, then we would, you know, then this court can just jump right into the merits. But we also have this DNA evidence, which is new. And that's something that we acknowledge has not been presented before, presented first before this court. And there certainly are procedural issues with respect to that. But when it comes to an actual innocence claim, we think that the same reasons why this court assumes that this right exists are the same reasons why this court should consider any evidence that does point towards innocence. Given the high standards that you've got to meet on this claim, actual innocence claim, there seem to be three things that bothered me. One, there's not one whit of affirmative evidence that your client is innocent. Two, the physical DNA evidence does not disprove that Weakland did not do what he did, nor that your client hired him to do it. And three, the jury had all of your impeachment evidence in front of it before it convicted your client.  Well, I'm just trying to say, I mean, I had those three things. After everything I got through, when you've got to prove he's innocent, I said to myself, there's no affirmative evidence he's innocent. The physical DNA evidence doesn't disprove that Weakland did not do what he did, and it doesn't disprove that your client hired him to do it. And there's nothing that you're arguing to me that you didn't argue to the jury. They had all that impeachment evidence in front of them, and they said, too bad, I don't believe it. So therefore, I don't know how you're going to get to actual innocence. I don't know if actual innocence requires that the new evidence itself is the make-or-break evidence that points to affirmative innocence. We think that all of the evidence, when looked at together, which would be the test, shows that he's actually innocent. It's not just one piece of evidence that points affirmatively to innocence. We think that when you look at the fact that Weakland's testimony is inconsistent with the physical evidence, that State's theory doesn't make any sense, that there's this new DNA evidence that supports the argument that there may have been somebody else who did the killing, we think that it would be enough to establish actual innocence. Thank you. Could I ask about the confrontation clause claim for a second? Sure. So if you think, say we agree with you that it was exhausted, I don't think you've really explained what the claim itself is or how it helps you or how you win on it. So could you just elaborate on that a little bit? My understanding is that one of the ways that the defense at least was thinking about attacking Weakland's moral transformation was that they were going to ask him about some of the bad things that he did when he was in prison to show that this moral transformation isn't true. And going back and reading through the cross-examination, it looks like that the court cut that off and says, you know, And it appears that the defense had presented that good faith basis. He said, I have this affidavit, but the court said, no, you can't ask about it. So I believe that's the claim. And how would it get over a harmlessness problem like Judge Smith was asking about, about all the other impeachment that there already was? Well, I think it goes back to the weaknesses in the state's case in general. So one part of the harmless error analysis is always going to look at the strength of the state's case. And, you know, take my word for it, you can look at all the dissents from the Nevada Supreme Court talking about the problems with the state's evidence. So the impact of that is going to be greater. Thanks. Thank you. Any other questions? No. I'm sorry to have cut you off. We'll listen to the state. Good morning, Your Honors. May it please the Court. Lawrence Van Dyke on behalf of the Nevada State Respondents. And unless the Court would prefer a different way of addressing it, I was just planning to go through the order that we addressed these particular issues in our brief, Your Honors. Well, I'm sure that none of us are bashful up here, and we're pretty prepared. I can tell that my colleagues are both very well prepared. So we'll interrupt you. You can start out where you want to, and we'll probably go at it a little bit. Sounds good, Your Honor. So starting with the insufficient evidence argument, it seems to me Mr. Lupina makes two main theories on insufficient evidence in his appeal. One of those, I would point out, I think is a new theory that he's made on appeal. The other one is one that has literally been made in this case since before trial because there was a habeas petition to the State Court before trial about that particular issue. So I was just going to address those two. His new theory, his main argument, is that Weakland didn't do it, and so he couldn't have hired Weakland to do it. And we pointed out this change in our briefing. We said, hey, this is a, he's never really contested this fact in this case. And he says, in his reply brief, what are you talking about I've contested it? And he cites a whole bunch of spots in his opening brief. Of course, we weren't saying he hadn't contested it in his appeal. We said he hadn't, this was a new issue in this appeal. He hadn't contested it before, and he never really has shown otherwise, Your Honors. And that's important because it points out, I think, something that I think has come out in the discussion with my friends on the other side, which is with the Court's discussion with them, which is this is just a really speculative claim of insufficient evidence or actual innocence, I think. Their claim is really speculative. In fact, as the Court no doubt knows, having read the briefs, he lists no less than four other people that would be responsible for this crime other than him. Ironically, one of those people is Mr. Weakland, who he says couldn't have done it. So there's some inconsistencies there. There's a lot of speculation. It makes for very exciting reading. And I don't say that facetiously. It was probably the most exciting briefing that I've ever read. But it doesn't, I don't think, come close to meeting the high demanding standard for an insufficient evidence argument. I want to point to a few. Well, the problem comes in insufficiency of evidence, and he never addressed it, but that in our situation we have to suggest that any rational trier of fact could not have found that these crimes were proven beyond a reasonable doubt. He didn't argue about it. He did in his brief. But that's the problem that I have with those arguments. And I expect you'd say, Judge Smith, you're dead on. It's a very demanding standard, Your Honor. But I think there's something I do want to point out that the Court may not be aware of about that I think even undermines his arguments, and that is his first main argument, of course, is that Weakland didn't kill Mrs. Krauss. And the reason he didn't, and I'm quoting from Pastry on Obring, is because when Weakland described how he killed Mrs. Krauss in his testimony, he says that that doesn't begin to match up with the physical evidence. And that's his main argument on insufficient evidence and also actual innocence. But I want the Court to look at that, because what did Weakland say he did? Weakland said that he slit Mrs. Krauss' throat and then he stuck the knife in her back. That's what Weakland said. Nobody contests that. The PINA understands that. And in fact, the physical evidence was that Mrs. Krauss' throat had been slit and that the knife had been stuck in her back. And so this isn't even the case. But that's not how she was killed, right? Well, actually, that's not true. If I recall correctly, it says there's three different things that actually caused her demise. And one of them was the throat being slit, but the other was being strangled, and the other was being stabbed in the neck. And so that's the PINA's argument. But, I mean, if you have strangled someone and stabbed them in the neck, and then after that you slit their throat, don't you think you mention those things? I mean, there is some ---- Well, actually, I'll get to that in a second, Your Honor. But first of all, I do want to point out that I don't think that there was evidence that she was killed by strangling versus stabbing in the neck versus the other. I don't think the coroner was clear which one actually killed her. So he just said there were three things that could have killed her, plus the knife stuck in her back. Even so, though, they're pretty significant things to omit. Well, I guess so, although since I don't murder people, I don't know what happens to a person. I don't know that any of us really can know what goes through a person's mind. Mr. Lupina ---- I mean, sorry, Mr. Wheatland did testify that, you know, there's a lot of testimony in this case. And he did testify that he was sick, that he just wanted to get out of there, that he didn't remember well. And I'll point to a few of those things here in the record that aren't mentioned anywhere in Mr. Lupina's briefing. But Mr. Lupina's ---- I just want to go back. Mr. Lupina's big argument, as Your Honor points out, is that she ---- because she was strangled and stabbed, that, quote, leads to one conclusion, that Wheatland did not kill Hilda. The problem with that just on its face is that, keep in mind, this is not actually inconsistent testimony. This is just Wheatland saying, I did these two things. Everybody knows, says, yeah, those two things were done, but there's these other two things that were done. And he's saying, well, because he didn't mention those two things, that that means he couldn't have killed. That's a very strong reading of the evidence. They're not even inconsistent. And I'm not sure that even if there was this ---- if that was all there was to it, I don't think he would have a chance of prevailing. But that's not all there is. How do you explain why Wheatland kept recanting? Say that again. Why did Wheatland recant? I don't know. I don't know.         And the other thing I would say is that the jury, as you know, didn't believe it. So the jury knew. I think as your Honor pointed out to opposing counsel, I mean, Mr. Wheatland was all over the place. And to be clear, I'll get to that in a second on the cooperation issue, but the jury was well aware of that, that he was all over the place. I don't think the jury, I don't think any rational jury member would have thought, I don't know which story to believe. The jury was very well aware that he had said, he had said, Mr. Lapina and Ms. Maxwell hired me to do this. And then later he came in and said they had nothing to do with it. And then he came back and said they hired me to do it. And the jury was, that part the jury was extremely aware of, along with all the other impeachment stuff. And so if you're a jury, you have to decide what are we going to believe. And I think I'll get to that in a little bit. But I think, I think that the reason they believed what they believed was because of the corroborating evidence. And I'll talk about it in a second. But I do want to point one thing out that's really important, and that is this idea that they quote Lapina on page 3 of the reply says that Wheatland, quote, consistently denied stabbing Hilda's neck or attempting to strangle her. And in fact, that just isn't true, Your Honors. If you look at the very pages of the record cited by Lapina, Wheatland testified that he brought a cord with him to the crime. So he brought this, I think it was electrical cord or something. And when asked by, when he was asked, quote, at any point did you use that cord to strangle Hilda Kraus? His answer was, I may have. I don't recall. That's Supplemental Excerpts of Records 676. And when asked again, did anyone ask you, he's talking about like when he was interviewed by the police and such. Did anyone ask you if you had, did anyone ask you if you strangled Hilda Kraus? He answered, I don't believe so. So he's not saying I don't believe I didn't strangle her. He's saying, I don't believe anybody ever asked me about that. And then he says, I, you know, tied her hands and feet. I'm not sure if I tied it around her neck or whatever. I don't remember. And as Your Honor said, I mean, that might sound incredible to us. I think we assume that if we murdered somebody, we would remember every detail. It would be such a great, but I don't know how that works. All I know is what was in the testimony. And what was in the testimony is not that he consistently denied stabbing her neck or strangling her. And to the stabbing of the neck with regard to the neck wounds, when he was asked, is it possible you could have punctured Mrs. Kraus with the knife during the course of the killing, talking about the neck wounds? And Wheatland answered. So can I just stop you for a second? So it seems. Could you? Wheatland answered. What did he answer? It's very possible, Your Honor. And this is supplemental excerpt 691. So the Court knows where that's at. So what I was going to ask is, it seems like part of your response to them is when they say we should have had the impeachment evidence about him getting this favorable treatment and that's why he changed the story again. You say, well, he's already impeached so much that it doesn't matter. But if you take out Wheatland's testimony, do you have a case? Well, I don't think that's the standard, that you have to have a case. But I do think that under Nevada law, and I think the proper way to look at it is, what did the jury have to do in order to figure out, you know, you could have somebody whose testimony, who was the classic incredible witness, which everybody here agrees that Wheatland was the classic incredible witness. You could have somebody like that, but you could have enough cooperation for the jury to say, you know what? He literally, as in this case, has said two absolutely contradictory things. They told me that they hired me to do it. They had nothing to do with it. And the jury is well aware of that and say, there's enough cooperation that we're going to believe. We have no idea what we would believe with this totally incredible witness, except for the fact that there's enough cooperation that we're going to believe. So does the corroboration stand on its own, or do you need Wheatland? Because it seems like you want it both ways. You want to say to them, look, he's so impeached that it doesn't matter that they didn't impeach him more. And yet you also want to say, but, yeah, we can believe him for helping the gaps in the case. I don't know. I mean, I guess I can talk in a second about whether corroboration stands. But I do want to point out before I do that, that I don't think that that's the standard. I don't think it has to be. I don't think we have to just act like Wheatland could not be in this case at all. Wheatland can give his testimony, and then it's up to the jury to decide whether or not they believe. How much they believe. It's up to the jury to assess credibility. And when you have a highly incredible witness, I think maybe the right question would be, could he be convicted on Wheatland's testimony alone? And I'm not sure he could have. In fact, the Nevada Supreme Court threw it out in the first case based on that type of rationale. But here's what we can say. But to get past the ineffective assistance argument, you need us to believe that it didn't matter that he wasn't impeached more with this very arguably very probative thing about why he's changed the story again, and or that there was no prejudice because he was already impeached so much. So it just seems kind of intention, then, with your reliance on him. Well, I think it only seems intention. My — I think it's pretty clear here what the jury — what any reasonable jury would — juror would be faced with here. And that is, I've got a guy that they've done an amazing job. They've shown that he's a pathological liar, that he's a psychotic killer. They've shown that he has given this inconsistent testimony. He's literally said the opposite things. I don't know what to believe by this person, so what am I going to believe? And I think they go to the corroborating testimony. And the corroborating testimony here was LaPina had a cellmate. And the cellmate — the cellmate said, LaPina told me that he actually hired Wheatland to kill to kill. And so that's — that's big corroborating testimony. And LaPina's argument has always been, well, you can't believe — you can't believe Fish because he's a — he's a criminal, you know. He's not — and — but, again, that's why we have juries, is to assess that kind of credibility. And, of course, every jailhouse informant is a criminal. So, I mean, or maybe not — maybe not all of them, but they all — you can always use that argument that they're — and so — and in addition to that, of course, I think the brief was pretty clear about all the corroborating testimony from Wheatland's wife or ex-wife, Gail Wheatland, and how she was — she was literally returning the gloves that had been used in the crime to LaPina afterwards. How were the gloves used in the crime? I was quite confused about the role of the gloves. I've never had any lead-filled gloves, but apparently what Wheatland testified was that we came in and he hit — so Mrs. Krause is laying on the ground. She's tied up. And he hit her in the back of the head with the lead-filled gloves, knocked her out, and then — And these are like boxing gloves filled with lead? That's what this is? I don't know if there's something akin to brass knuckles or if — you know, whether they're used in boxing. I don't — I can't imagine they'd be used in boxing. You wouldn't think that would be very fair. I think they're more like brass knuckles, sort of something you would use like But I don't know, and I wouldn't want you to think I know, Your Honor. So, you know, and then, of course, the other thing I want to point out is that LaPina and Maxwell — remember, Maxwell is the woman that was involved here, the other part of the love triangle. They supplied corroborating evidence also because, you know, they talk about how incredible it is, this idea, this — the fact that LaPina — that — this double inheritance idea. But, you know, I'm looking here at Supplemental Excerpts 2430, and Maxwell was asked about — Maxwell was asked by the investigators about what did you and Krauss talk about with regard to marriage? And she testified, 2430-31, that, yeah, we talked about the fact that if we could get — that if his wife wasn't there, he would consider marrying me. So the testimony is there. The evidence is there that she had a motive. LaPina obviously had a motive because he said he was fine with her having a relationship with Krauss as long as the money kept coming in. So there's a lot of corroborating evidence. I'm running out of time, so I'd like to talk real briefly about two other things I think are important that you had asked the opposing counsel about. One is the Herrera-Axel innocence claim. In a lot of ways, that claim is very similar, obviously, to the ineffective — not the ineffective assistance, the insufficient evidence claim. I do want to point out, though, with regard to the standard on that claim. One is I don't think they can meet it. And so I think this Court could deny it for — I think — I think Judge Smith said, you know, we — I think I understood you to be saying that, you know, we keep on denying these claims, but denying them hypothetically saying if there was such a claim, we — and I think that's the kind of case this would be. This Court could do the same thing. And maybe it's not very satisfying, but this Court could do the same thing. It could say we don't know whether there's a Herrera claim, but if there is, we aren't even close to meeting it, because they lay out this probably innocent standard. But of course, keep in mind, that language is taken from the dissenters in the Herrera  case. In the Sloop case, which came after the Herrera case, where again the Court said we're not going to decide whether there's a Herrera-type actual innocence claim, but we are — the majority said if there was, this is what the majority in the Sloop case said on 317, a Herrera-type claim, this is the U.S. Supreme Court majority, could — would have to fail unless the Federal Habeas Court is itself convinced that these new facts unquestionably establish innocence. That's a very high standard. I suppose you could try to merge those two standards somehow, but that's an extremely high standard. So even if there was such a claim, they couldn't meet that standard. They couldn't even meet a probably standard. And so with the last thing I want to — I think it was Your Honor's last question to him at the end of his time there about the confrontation clause. I'll just add to that what actually happened, because I think it is helpful to know. What happened was defense counsel, Lupien's counsel, asked Weakland and said, hey, did you — you murdered Lloyd Paulette, didn't you, in jail, right? And like he said, it was part of the further impeachment. And the court actually allowed — it wasn't that the court — the trial court let him ask that question. But then when Weakland said, no, I didn't murder Mr. — Mr. Paulette, then what happened is he said, I've got five affidavits from other inmates that will — that will say that you murdered Lloyd Paulette. And that's where the court cut him off. And as Your Honors are undoubtedly aware, whether you're in Federal court or State court, in Nevada State court or Federal court, the rules are the same. You cannot impeach with extrinsic evidence. So you can say, isn't it true you beat up — you know, that you lied on your tax returns or whatever. But you can't then bring in those tax returns. And that's what he was trying to do here. So, you know, he did not exhaust that claim. But even if he had exhausted that claim — and this Court can do that under Habeas. You can deny the claim on the merits. So he didn't exhaust it, but even if he didn't exhaust it, it has no merit, Your Honors. Thank you. Thank you, Your Honor. We've heard your testimony. I don't know how long we took you, but I'll give you a minute. Okay. I appreciate it, Your Honor. There's just two things I wanted to say. First, I wanted to address the corroborating evidence, because I didn't direct it. I didn't address it on the prior argument. None of the corroborating evidence corroborates Weakland's claim that he killed Hilda or that Frank had hired him. The corroboration is just that Weakland — Just a minute. I don't think that's true. There was some corroborating evidence where one guy was trying to think what his name  Let me get my notes. I have to go through these. It seemed to me that Fish said that LaPena told him he did hire him. Yeah. Well, Fish had significant credibility issues. That's corroborated well. Credibility. Well, I'll just say outside of Fish, but if we focus on Fish, I think that that's absolutely fine. The bottom line is the jury knows how credible or uncredible Fish is, and they must have believed him. I don't know if they necessarily believed Fish. Your client was guilty. Okay. Well, setting aside Fish, let me just mention my second point, is that the coroner was clear about how Hilda died. The coroner said that she died due to the severance of the vertebral artery, which is way back in her neck. And the coroner was also clear that that artery was severed based on the fact that they were connected because the vertebrae around the severance were fractured. So they were fractured when whoever committed the murder stabbed that vertebral artery. And that's how we know that Weakland couldn't be the killer, because Weakland did not have blood on him. The killer would have had to have blood on him because it was a severed artery. Unless the killer wore gloves and disposed of them. A severed artery would have spurted blood. May have. Would usually, but may have. Well, we have physical evidence at the scene showing this because there was blood spray. How many times did you argue this in front of the jury? It was argued before the jury in closing argument. Several times. Again. That is true. I'm back to my question. You argued all of these things in front of the jury, and they said, I don't believe any of it. And so, therefore, I'm having a tough time. You've given your best argument to them. You want me to second guess them. That's all you want. Not necessarily. We are saying that there is a level of rational conclusion that this Court is allowed to look at. And we just can't see how anybody can rationally conclude that Weakland was the killer when the physical evidence just doesn't support anything that he says. All right. You've heard your argument. Thank you very much. Gave you extra time. The case with Lepina v. Laxalt is submitted, and this Court is adjourned for today. Thank you very much for your arguments. Appreciate them very much. We tried our best to put you on the spot a little bit, but we appreciate how you helped. We couldn't do this without good lawyers, so thank you very much.
judges: Wallace, N.R. Smith, Friedland